**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | : | CIVIL ACTION NO. 1:18-cv-00620 |
| PLAINTIFF, | : | JURY DEMANDED |
| v. | : | |
| JIONGSHENG ZHAO, | : | |
| DEFENDANT. | : | |

**COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, AND OTHER RELIEF**

Plaintiff Commodity Futures Trading Commission ("CFTC") alleges as follows:

### I. SUMMARY

1. From at least July 2012 through at least March 2017 (the "Relevant Period"), Defendant Jiongsheng Zhao ("Zhao") engaged in a manipulative and deceptive scheme while placing orders for and trading futures contracts on a registered entity. In furtherance of this scheme, Zhao repeatedly engaged in manipulative or deceptive acts and practices by "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution). On thousands of occasions, Zhao placed an order that he wanted to execute and thereafter entered a larger order on the opposite side of the market that he intended to cancel before execution. In placing these larger spoof orders, Zhao intentionally or recklessly sent false signals of increased supply or demand designed to trick market participants into executing against the orders he wanted filled.

2. By virtue of this conduct, as further described herein, Zhao has engaged in acts and practices that violate Sections 4c(a)(5)(C) and 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6c(a)(5)(C), 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).

3. The CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Zhao's violative acts and practices and to compel Zhao's compliance with the Act and Regulation. In addition, the CFTC seeks civil monetary penalties and such other relief, including but not limited to disgorgement and trading and registration prohibitions, as the Court deems necessary and appropriate.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress. Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief in any proper district court of the United States against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

5. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, because Zhao transacts business in the Northern District of Illinois, and the acts and practices in violation of the Act and Regulation have occurred within this District.

## III. THE PARTIES

6. Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and

rules, regulations, and orders thereunder. The CFTC is headquartered at 1155 21st Street, NW, Washington, DC 20581.

7. Defendant **Jiongsheng Zhao** is a resident of New South Wales, Australia. Zhao has been employed by a proprietary trading firm (the "Trading Firm") as a trader for nearly nine years. Zhao has never been registered with the CFTC.

### IV. OTHER RELEVANT ENTITIES

8. The **Chicago Mercantile Exchange** ("CME") is a commodity exchange located at 20 S. Wacker Street, Chicago, Illinois 60606. It is registered with the CFTC as a designated contract market and a swap execution facility.

9. **CME Group Inc.** ("CME Group") is a Delaware corporation with its principal place of business in Chicago, Illinois. CME Group is the holding company that owns CME.

### V. FACTS

#### A. Futures Trading Background

10. A futures contract is an agreement to purchase or sell a commodity for delivery or cash settlement in the future at a specified price. A futures contract traded on an exchange has standard, non-negotiable contract specifications.

11. The E-mini S&P 500 Index futures contract (the "ES contract") is traded on CME, a registered entity. There are four ES contract delivery months: March, June, September, and December. The ES contract is cash settled so no delivery of the stocks that make up the underlying index takes place.

12. The ES contract trades 24 hours per day from 5:00 PM Central Time on Sunday night to 4:00 PM Central Time on Friday afternoon, except for a 15-minute window each day when trading halts. The trading day for the ES contract is commonly regarded as consisting of two trading sessions: the daytime session and the overnight session. The daytime session

3

corresponds with open-outcry trading at the CME and runs from 8:30 AM to 3:15 PM Central Time. The overnight session begins after the 15-minute trading halt and runs from 3:30 PM to 8:29:59 AM Central Time the next day. The daytime session corresponds with, but does not perfectly overlap, the trading day for the stocks that make up the underlying index, which runs from 8:30 AM to 3:00 PM Central Time on the NYSE and NASDAQ exchanges.

13. The value of the ES contract is the S&P 500 stock index multiplied by fifty dollars. The price of the ES contract is quoted in index points, and the minimum price change allowed during a trading session is one-quarter of an index point (0.25); thus, if a trader wished to place an order above the last traded ES contract price of 2648.25 points, that trader would have to place the order at 2648.50 points or higher. This minimum price change is commonly called a "tick."

14. An "order," in the context of electronic exchange trading, is a request submitted to an exchange to buy (that is, "bid") or sell (that is, "offer" or "ask") a certain number of a specified futures contract. An order is for one or more contracts. Contracts may also be called "lots," among other things. Orders are entered into the exchange's order book. When there exists both a willing buyer and seller for a contract at a given price, a transaction occurs and is referred to as a "fill" (or a "trade" or "execution"). At any time before the order is fully filled, the trader can "cancel" the order. When an order is canceled, the contracts that have not yet been bought or sold are pulled from the order book.

15. Each trader can view the aggregate number of contracts and orders that all traders are actively bidding or offering at a given price level. Only the total numbers of orders and contracts at various price levels are visible, not the identities of the traders who placed the orders. The best-bid level, or first-bid level, is the highest price at which someone is willing to buy. The

best-ask level, or first-ask level, is the lowest price at which someone is willing to sell. The bid-ask spread is the difference between those two prices.

16. Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels. This combined bid and ask information is often referred to as the visible order book and represents the visible market depth. Traders often consider information in the order book when making trading decisions.

17. An "aggressive" order is an order that crosses the bid-ask spread. On the buy side of the market, an aggressive buy order is placed at the best-ask price or higher so, put simply, it is an offer to buy at a price that another trader is currently willing to sell. On the sell side of the market, an aggressive sell order is placed at the best-bid price or lower so, put simply, it is an offer to sell at a price that another trader is currently willing to buy. Accordingly, aggressive orders are guaranteed to execute, at least partially, immediately after being placed.

18. A "passive" order, on the other hand, does not give up the spread in price. On the buy side of the market, a passive buy order is placed at the best-bid price or lower so, put simply, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell. On the sell side of the market, a passive sell order is placed at the best-ask price or higher, so, put simply, it is an offer to sell at a price that is higher than the price that other traders are currently willing to buy. Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

19. The ES contract is traded electronically on the CME Globex trading system ("Globex"). Globex employs a matching algorithm to match bids and offers for execution. The matching algorithm for the ES market is known as "FIFO," which denotes first-in, first-out. Under the FIFO method, orders on the same side of the market (i.e., the buy side or sell side) and

at the same price are filled based on time priority; thus, with a few exceptions not pertinent here, the order that was placed first trades first, irrespective of the order's size.

### B. Zhao's Manipulative and Deceptive Scheme

20. Zhao has worked as a trader at the Trading Firm for nearly nine years. In this role, he trades futures contracts on U.S. and international exchanges. Zhao does not trade on behalf of any party other than the Trading Firm. He shares any profits generated from his trading with the Trading Firm. Zhao's direct supervisor is the Trading Firm's CEO.

21. During the Relevant Period, Zhao engaged in a manipulative and deceptive scheme (the "Scheme") that consisted of the following general pattern: (1) placing one or more passive small orders (that is, fewer than fifty contracts) on one side of the market, which he intended to execute ("Genuine Orders"); (2) placing one or more passive large orders (that is, fifty contracts or more) on the opposite side of the market, within two minutes of placing the Genuine Order and while the Genuine Order is still pending, which he intended to cancel ("Spoof Orders"); (3) reaching at least a five-to-one total contract size imbalance between his Spoof Orders and Genuine Orders, respectively; and (4) canceling the Spoof Orders within two seconds after they were placed. Each instance of this pattern comprises a single "Event." Collectively, "Genuine Orders" and "Spoof Orders" are referred to as "Event Orders."

22. Zhao's Scheme was designed to benefit financially from market participants' reactions to his Spoof Orders. The following is a simplified explanation of how his Scheme was intended to work, using a hypothetical example of a Spoof Order on the buy side. A large Spoof Order to buy would result in an increase in demand in the order book (i.e., create or add to an order book imbalance in which orders to buy outweigh orders to sell). This increase would be visible to other market participants and may lead them to conclude that the price is likely to rise. This conclusion, in turn, would impact market participants' decisions, including prompting some

to attempt to purchase contracts before the predicted rise in price happens. In such a case, these participants would place aggressive orders to buy (i.e., at a higher price than the currently resting bids in the market), making execution of orders resting on the opposite side of the Spoof Order more likely. Finally, these bids would enable orders on the opposite side of the Spoof Order—including Zhao's Genuine Orders—to sell sooner, at a better price, or in larger quantities than they otherwise would.

23. Zhao carried out his Scheme on the ES contract market traded on CME. For some or all of the Relevant Period, Zhao traded manually, by submitting orders, cancelations, and modifications using a computer mouse or keyboard.

24. During the Relevant Period, as part of the ongoing Scheme, Zhao engaged in approximately 2,300 Events. As part of those Events, Zhao entered about 2,300 Genuine Orders and 3,100 Spoof Orders, with all of the Spoof Orders, according to the pattern described herein, quickly being canceled.

25. Zhao intended to cancel the Spoof Orders before execution, and often did so after his Genuine Orders were filled. The predictable sequence inherent in Zhao's spoofing pattern, which he engaged in thousands of times, demonstrates that Zhao was not reacting to market changes when he canceled the Spoof Orders; rather, he was carrying out a predetermined strategy that was not dependent on market conditions.

26. By engaging in the Scheme as described herein, Zhao entered Spoof Orders either to intentionally send a false signal to the market that he actually wanted to buy or sell the number of contracts specified in the Spoof Orders, or while recklessly disregarding the fact that entering his spoof orders would send such a false signal—a signal that injected false information about supply and demand into the market that could affect market activity. Zhao engaged in this

Scheme to trick other market participants into executing against his Genuine Orders on the opposite side of the market—allowing them to fill sooner, at a better price, or in larger quantities than they otherwise would. Zhao knew or recklessly disregarded that the Spoof Orders would create the false appearance of market depth and result in misinformation, thereby luring market participants to trade based on Zhao's spoofing. The risk that the Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by Zhao's Spoof Orders was so obvious that Zhao must have been aware of it. He knew that his Spoof Orders would appear in the order book and that traders often consider order-book information in making trading decisions; thus, Zhao was, at least, reckless with respect to the danger that his Spoof Orders would mislead other market participants.

27. Although Zhao's Spoof Orders were visible to the rest of the market, his identity as the originator of those orders was not. Only the total numbers of orders and contracts at various price levels are visible, not the number of traders or identities of the traders who placed the orders. Accordingly, Zhao knew that other market participants could not see that the same trader had placed both the Spoof Orders and the Genuine Orders, which might have tipped off market participants that his Spoof Orders were not bona fide.

28. Trading overnight was a key component of Zhao's Scheme and indicative of his wrongful intent. Zhao carried out his Scheme more than 99% of the time during overnight sessions, when trading volume and volatility were substantially decreased. As a result of the reduced volume and volatility depth during overnight sessions, Zhao was able to use smaller Spoof Orders (with concomitant lower financial risk) to provoke the market reactions he desired.

29. The near-perfect correlation between Zhao's Scheme and his use of overnight sessions cannot be explained by his residing in Australia, where the overnight session largely occurs during daylight hours. Setting the Scheme aside, Zhao often traded during daytime sessions, which overlaps with nighttime in Australia. Indeed, nearly one-third of Zhao's non-Event orders (i.e., orders that were not part of the Scheme) were placed during daytime sessions; thus, Zhao's focus on carrying out his Scheme almost exclusively during overnight sessions is indicative of his wrongful intent.

30. Further, Zhao's trading pattern shows he avoided placing large Spoof Orders when they were more likely to execute. Had Zhao actually wanted to trade the quantities in his Spoof Orders, he would have placed similar-size orders during daytime sessions, when trading volume was higher and the larger quantities were more likely to execute; however, he did not. As reflected in the table below, during the Relevant Period, Zhao placed only about 2% of his large orders (both Spoof and non-Spoof) during daytime sessions. By contrast, Zhao placed about 29% of his small orders during daytime sessions; thus, Zhao avoided placing large orders when they had better chances of executing, but he did not similarly curtail his small orders. This further indicates that large order sizes were not an aspect of Zhao's legitimate trading. Rather, they were part of a scheme to mislead market participants by falsely signaling increased supply or demand for the purpose of luring market participants to trade based on his spoofing.

| Orders by Time of Day During the Relevant Period<br>**Event and Non-Event Combined**<br>(values are approximate) | | | |
|---|---|---|---|
| | Total Number of Orders | % Placed in Daytime Sessions | % Placed in Overnight Sessions |
| **Large orders (≥ 50 contracts)** | 3,790 | 2% | 98% |
| **Small orders (<50 contracts)** | 62,700 | 29% | 71% |

31. Zhao's Scheme frequently worked as planned; that is, his Spoof Orders tricked other market participants into executing against his Genuine Orders. However, there were times that Zhao's Genuine Orders continued to sit, unfilled, even after he placed and canceled his Spoof Orders; thus, not all of the Events resulted in executions of Zhao's Genuine Orders. Still, Zhao's Genuine Orders seldom terminated in cancelations, again demonstrating the differing intent behind his Spoof and Genuine Orders. Even though, by definition, 100% of Spoof Orders terminated with at least a partial cancelation, the same was true for only about 22% of the Genuine Orders. The difference is that Zhao wanted his Genuine Orders to execute.

32. Zhao also took steps to protect his Spoof Orders from execution. For example, he canceled the Spoof Orders almost immediately after placing them; their median cancelation time was 737 milliseconds, as illustrated in the table below. By contrast, on those rarer occasions when Zhao canceled his Genuine Orders, the median cancelation time was 106 seconds. This means that Zhao allowed his Genuine Orders to rest prior to cancelation for a much longer period than his Spoof Orders. The consistently fast cancelation times for Zhao's Spoof Orders reflect his intent to cancel them from the outset.

| Cancelations of Event Orders (values are approximate) | |
|---|---|
| | **Median Time to Cancelation** |
| **Spoof Orders** | 0.737 seconds |
| **Genuine Orders** | 106 seconds |

33. Zhao's efforts to avoid execution of his Spoof Order were successful. This is reflected in vastly diverging rates in which Zhao's Genuine and Spoof Orders were partially or fully filled (the "hit rate"). As reflected in the table below, Zhao placed approximately 2,300 Genuine Orders during the Relevant Period. Of these, about 79% were hit. By contrast, less than 1% of the approximately 3,100 Spoof Orders were hit. Thus, Zhao's Genuine Orders were about 180 times more likely to be hit. As a general matter, whether an order is hit is not dependent on its size; rather, orders at the same price level execute according to time priority under the FIFO matching algorithm. Here, the stark contrast in hit rates results from differences in the orders' relative competitiveness, over which Zhao had control, and illustrates his success in avoiding execution of his Spoof Orders.

| Orders Hit in Events (values are approximate) | | | |
|---|---|---|---|
| | **Total Orders in Events** | **Number of Orders Hit** | **Percentage of Orders Hit** |
| **Genuine Orders** | 2,300 | 1,800 | 79% |
| **Spoof Orders** | 3,100 | 10 | <1% |

11

34. The use of large orders was a hallmark of Zhao's Scheme; he rarely placed large orders otherwise. He placed about 3,800 large orders during the Relevant Period; 82% of those were placed pursuant to the Scheme as Spoof Orders. By contrast, Zhao placed about 62,700 small orders during the Relevant Period. Only about 4% of these orders fell within the Scheme as Genuine Orders. Zhao's limited use of large order sizes, nearly always as part of the Scheme and not as part of a legitimate trading strategy, is indicative of his illegal conduct. He primarily used large orders to send false signals of increased supply or demand to market participants.

C. **Examples of Zhao's Scheme**

35. Zhao's Scheme is illustrated in the three Events set forth below. Detailed trade data associated with these Events is provided in Exhibit A to this Complaint.

1. *Event Example 1: April 15, 2013*

36. Zhao's trading in the early morning of April 15, 2013 constitutes an Event pursuant to his Scheme. *See* Ex. A at 1–8 (displaying detailed trade data). At 1:11:16.287 AM Central Time (denoted in hours, minutes, seconds, and milliseconds), Zhao placed an order to sell one contract (the Genuine Order) at the best-ask level. *See id.* at 1, row 2. About ten seconds later, at 1:11:25.537 AM, Zhao placed an order to buy 151 contracts at the best-bid level (the first Spoof Order). *See id.* at 2, row 33. The first Spoof Order doubled the number of contracts then resting at that level of the order book, but the order was not at risk of executing until the 151 contracts resting ahead of it executed or were withdrawn. Zhao's first Spoof Order did not immediately induce execution of his Genuine Order, and he canceled it at 1:11:26.240 AM (only 703 milliseconds after placing it). *See id.* at 2, row 47. A short time later, Zhao tried again. At 1:11:33.363 AM, he placed an order to buy 171 contracts at the best-bid level (the second Spoof Order), more than doubling the number of contracts resting at that level of the order book. *See id.* at 3, row 89. This time, Zhao's Genuine Order executed at 1:11:33.366 AM, immediately

after the second Spoof Order was placed. *See id.* at 4, row 103. He then canceled his second Spoof Order at 1:11:34.161 AM, within 798 milliseconds of placing it. *See id.* at 8, row 252.

### 2.  *Event Example 2: March 5, 2014*

37.  Zhao's trading in the final hours of March 5, 2014 shows an Event that did not result in execution of the Genuine Order, contrary to Zhao's plan. *See* Ex. A at 9–12. At 22:44:12.924 PM Central Time, Zhao placed an order to buy one contract (the Genuine Order) at the best-bid level. *See id.* at 9, row 2. Three seconds later, at 22:44:15.720 PM, Zhao placed an order to sell 201 contracts (the Spoof Order) at the best-ask level. *See id.* at 9, row 15. Zhao's Spoof Order was nearly 2.5 times the size of the combined orders then resting at that price level of the order book, but it was not at risk of executing until the 82 contracts resting ahead of it executed or were withdrawn. Zhao's Genuine Order did not immediately execute. Zhao canceled his Spoof Order at 22:44:16.394 PM, only 674 milliseconds after placing it. *See id.* at 10, row 40. He let his Genuine Order rest longer, but canceled it as well at 22:44:40.533 PM, about half a minute after placing it. *See id.* at 12, row 97.

### 3.  *Event Example 3: March 21, 2016*

38.  A third example occurred on March 21, 2016. *See* Ex. A at 13–18. At 7:31:28.726 AM Central Time, Zhao placed an order to sell 11 contracts (the Genuine Order) at the best-ask level. *See id.* at 13, row 2. About five seconds later, at 7:31:33.645 AM, Zhao placed an order to buy 82 contracts (the Spoof Order) at the best-bid level. *See id.* at 13, row 441. The Spoof Order was over half the size of the combined orders then resting at that price level, but it was not at risk of executing until the 153 contracts resting ahead of it executed or were withdrawn. Almost immediately, at 7:31:33.980 AM and 7:31:33.981 AM, Zhao's Genuine Order executed through one trade of one and one trade of ten contracts. *See id.* at 13, rows 456 & 458. Zhao

then canceled his Spoof Order at 7:31:34.389 AM, just 744 milliseconds after placing it. *See id.* at 18, row 617.

## VI. VIOLATIONS OF THE ACT

### COUNT I

### VIOLATIONS OF SECTION 4c(a)(5)(C) OF THE ACT, 7 U.S.C. § 6c(a)(5)(C)

### Spoofing

39. Paragraphs 1 to 38 are re-alleged and incorporated herein by reference.

40. By reason of the conduct described above, Zhao engaged in trading, practices, or conduct on or subject to the rules of a registered entity that is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).

41. In placing each Spoof Order, Zhao acted with the intent to cancel the bid or offer before execution.

42. By reason of the foregoing, Zhao violated Section 4c(a)(5) of the Act, 7 U.S.C. § 6c(a)(5) (2012).

43. Each Spoof Order constitutes a separate and distinct violation of Section 4c(a)(5)(C) of the Act.

### COUNT II

### VIOLATIONS OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1), AND REGULATION 180.1(a)(1) AND (3), 17 C.F.R. § 180.1(a)(1), (3)

### Use of a Manipulative and Deceptive Device, Scheme, or Artifice

44. Paragraphs 1 to 38 are re-alleged and incorporated herein by reference.

45. By reason of the conduct described above, Zhao, in connection with a contract for future delivery on a registered entity, intentionally or recklessly: (1) used or employed, or

attempted to use or employ, manipulative devices, schemes, or artifices to defraud; or (2) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon market participants.

46. Zhao acted intentionally or recklessly.

47. By reason of the foregoing, Zhao violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).

48. Each Spoof Order, Event, and Scheme constitutes a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3).

## VII. RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A. Find that Zhao violated Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017);

B. Enter an order of permanent injunction enjoining Zhao, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him who receive actual notice of such order by personal service or otherwise, from violating Sections 4c(a)(5)(C) and 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3);

C. Enter an order of permanent injunction enjoining Zhao, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, from directly or indirectly:

1. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for his own personal account or for any account in which he has a direct or indirect interest;

3. Having any commodity interests traded on his behalf;

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017).

D. Enter an order directing Zhao to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act, as described herein;

E. Enter an order requiring Zhao to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

F. Enter an order providing for such other and further remedial and ancillary relief, including but not limited to disgorgement, as this Court may deem necessary and appropriate.

Dated: January 28, 2018

Respectfully submitted,

PLAINTIFF COMMODITY FUTURES TRADING COMMISSION

**s/Christopher A. Reed**
Deputy Regional Counsel

Christopher A. Reed (MO Bar # 59025)
Laura Brookover (DC Bar # 1007639)
Commodity Futures Trading Commission
4900 Main Street, Suite 500
Kansas City, Missouri 64112
Telephone: (816) 960-7700
Facsimile: (816) 960-7751
creed@cftc.gov
lbrookover@cftc.gov

Attorneys for Plaintiff